UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

Criminal Case No. 24-CR-320-RMR

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ASHLEY DANIELLE BLACKCLOUD,

Defendant.

---

## DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING STATEMENT AND MOTION FOR UPWARD VARIANCE

---

Ashley Danielle Blackcloud, a.k.a. Trinity Blackcloud, submits the following in response to the government's Sentencing Statement and Motion for Upward Variance. Gov't Motion, Doc. No. 271. The government seeks an upward departure to 37 months on several bases including, that it says U.S.S.G. § 2H2.1, Obstructing an Election or Registration, best captures the harm here, warranting an upward variance; that it says Yemi Mobolade should be treated as being akin to an "official victim" under § 3A1.2 warranting variance; that § 2A6.1 fails to fully capture the harm of cross burnings as evidence by sentences in other district courts across the land where cross burning sentences were higher than the guideline sentence advised here; and, that this crime amounted to a threat of political violence. We write in opposition to each of these suggested bases for variance: the facts of this case as to Ms. Blackcloud are not even close to involving hate, political violence or election

interference; and, regardless, the current government of the United States protects those who commit election interference and political violence – even those who do so while displaying traditional signs of hate - such that any additional sentence of imprisonment for Ms. Blackcloud would be disparate with the way this government treats those types of offenders, in violation of 18 U.S.C. § 3553(a).

As to the § 2H2.1 issue, the government mostly defers to its previous filing that asked for the Court to depart under U.S.S.G. §§ 5K2.0(a)(2)(A) and 5K2 and use § 2H2.1.  Departures such as these are no longer part of the sentencing guidelines.  We have addressed the reasons that § 2H2.1 is entirely inappropriate and not analogous to what happened in this case in our previous filing addressing the government's request for a departure.  Doc. 245.  We defer to that filing in opposition to the request for variance but also note that the government does not present a single case to the Court to support this request. There was nothing about Ms. Blackcloud's role in this offense that was meant to hinder or obstruct Mobolade's campaign, the election or voter registration; it was meant to draw attention to racism and mobilize voters.

U.S.S.G. § 3A1.2(b) says to add six-levels if the victim in a case is, or was, a government officer or employee.  The guideline is said to apply to current or former government officials or employees. The purpose of this guideline is to punish more harshly those who target victims who hold, or have held, government positions as a means of protecting government officials/employees and minimizing the potential disruption to governmental functions as the result of such targeting.  *See* U.S.S.G. § 3A1.2, Note 5.    Mobolade was neither a current, nor former, government

employee/official at the time of the offense so none of these rationales apply to treat him as an "official victim" by means of variance. The government offers no cases to the Court in support of this basis for variance.

Next, the government says that sentences for cross-burnings are usually higher than that which is advised by the guidelines here, *ergo*, it says, Ms. Blackcloud's sentence should be higher than what is called for by the guidelines. The government cites nine district court cases from around the country where cross burning was charged and the defendants (mostly), received sentences greater than what is called for by the guidelines in this case. Gov't Motion for Variance, Doc. 271, p. 7. All nine cases involved charges under statutes that are typically used to prosecute cross burnings: 42 U.S.C. § 3631 (civil/housing rights violations), 18 U.S.C. § 241 (conspiracy against rights), related conspiracies and 18 U.S.C. § 844(h) (using fire or explosives to commit any felony, 10-year mandatory term of imprisonment). All nine cases involved defendants, white people, burning crosses in the yards of neighbors who were black with the intent to intimidate them out of the neighborhood. One also involved retaliation against a black family for participating in a civil rights protest. None of the cases cited by the government supports the notion that burning a cross in a public place when nobody sees it and then disseminating a video of it on social media with a message decrying the action as a political stunt should be punished more harshly than what is called for by the guidelines here. As has been repeatedly discussed, this case is very different than a traditional cross burning case because it was not a hate crime and it was not meant to threaten Moboalde or anyone.

Moreover, and as has been detailed in other pleadings throughout this case, the government made the decision to prosecute this case under 18 U.S.C. § 844(e). Section 844(e) was implemented to proscribe bomb and arson threats, real or fake, Using § 844(e) to prosecute this offense was a novel use of the statute but had to be used by the government because the "false information" about a threat language of § 844(e) was central to its theory (although legally dubious, as outlined in the pending Rule 29 and 33 motions) given that the government has always known this was a political stunt and not an actual threat to Mobolade.  Having made that charging decision for its own purposes and based on what it could p rove, the Court should not accept the government's invitation to vary upward by analogizing the conduct to conduct covered by other guidelines not charged or proven.  The government cites no case where this has been done.

The government cites *United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006), where the defendant telephoned the Department of Homeland Security from a hotel room in Calgary, Canada in 2004, and made a phony bomb threat, claiming that four of his acquaintances were terrorists involved in a plot to bomb several shopping malls near a federal building in Los Angeles, California.  The defendant phoned the tip in and claimed to be a former member of al Queda and gave specific dates/locations that the attacks were planned to take place.  Law enforcement took the threats seriously and devoted substantial resources to preventing the attacks.  The hoax disrupted business and government operations in the area.  The sentencing judge varied upwards because of the disruption of governmental functions, the harm to the people

of Los Angeles, the harm to the four acquaintances falsely accused and because the defendant was preying on societal stress so shortly after September 11.  None of these cases say that sentencing courts should vary upward by using guidelines inapplicable to the sentencing offenses and none have factual scenarios that have any bearing on what the Court has before it with Ms. Blackcloud.

The government cites *United States v. Wheeler*, 776 F.3d 736, 745 n. 4 (10th Cir. 2015), which was a case charged under 18 U.S.C. § 875(c) where the defendant, upset with police in Grand Junction over his recent drunk driving arrest, posted three times on Facebook that his followers should kill cops, "drown them in the blood of their children," "kill their entire bloodlines," commit massacre at stepping stones preschool and daycare,"  and that they should "just walk in and kill everybody."  The defendant included the names of the officers involved in his arrest and also said that these acts of violence should occur unless his drunk driving charges were dropped.  Wheeler was convicted by a jury, but his conviction was overturned because the jury was improperly instructed on the required intent to threaten for the statements to be a "true threat."  On remand, the charges against Wheeler were dismissed.  *United States v. Wheeler*, 12-cr-138-WJM, Doc. 306 (D.Colo. Feb. 23, 2016).  The government says *Wheeler* supports an enhanced sentence here because the internet was used. There is nothing about *Wheeler* that supports the government's argument that this crime was more serious because the internet was used.  In fact, the only reason this was a crime at all was because the internet was used, so *Wheeler* does not help the government's argument for upward variance.

*Wheeler* involved a charge of § 875(c), interstate communication of a threat. That section is "one of the most used to prosecute threats to public officials" according to the article cited by the government that was published in the CTC Sentinel, a publication of the Combating Terrorism Center at West Point aimed at confronting "contemporary terrorism threats."  Pete Simi et al*., Rising Threats to Public Officials: A Review of 10 Years of Federal Data*, 17 CTC Sentinel, Vol. 17, Issue 5 (May 2024). Section 875(c) was not charged here and the article cited does not provide any support for substituting sentences appropriate for an § 875(c) conviction when § 875(c) is not charged.  The article points out the obvious that political threats and violence are problematic and on the rise.  It lists the following examples:

> A California man left a death threat on the voicemail of an Arizona election official. An Indiana man promised to murder any U.S. government official who supports Israel. A Virginia man told a Veterans Affairs employee that he "understood why Timothy McVeigh did what he did." A Washington State man left a voicemail with the U.S. Capitol Police that he wanted to "hunt down Joe Biden.

*Id.*  These cases, like *Wheeler*, involved direct and specific threats to harm public officials, not a political hoax that nobody saw until it was on social media with an accompanying post decrying it.

Even if the Court were to accept the government's cast of this offense as election obstruction and/or political violence, an upward variance would not be warranted because such prison sentence would create disparities with the way this government, under this administration, treats election interference, political violence and those who endorse symbols of hate.  This government, via the President of the

United States, has pardoned, or granted clemency to, over 1500 people convicted of crimes, many of them violent crimes, related to the events of January 6, 2021 at the United States Capitol where supporters of the President used force, trespass, property damage and violence to try to stop the certification of the results of the 2020 election.[1]  This includes commutations and/or pardons for the leaders and members of the Oath Keepers and Proud Boys who had received long sentences for seditious conspiracy.  Those groups are seen by many as promoting white supremacy, male supremacy, anti-LGBTQ and antisemitic values, though publicly the groups deny such values.[2]  Some of the January 6 defendants pardoned were displaying symbols that most people associate with white supremacy and antisemitic hate such as swastikas, a "Camp Auschwitz" sweatshirt and the confederate flag.  *See generally* Final Report Select Committee to Investigate the January 6th Attack on the United States Capitol, 117th Congress Second Session, House Report 117-663 (Dec. 22, 2022) and pp. 654-655.  In addition to the 1500 people who received pardons or commutations for their involvement in the events of January 6, 2021, 300 people had their pending indictments related to the events of January 6, 2021 dismissed per the President's order.  In addition to general rioting, trespass and property damage, one rioter/protester was killed, members of Congress and their staffs were threatened with violence and:

---

[1]     https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/

[2]     https://www.adl.org/resources/backgrounder/proud-boys;     https://www.splcenter.org/resources/extremist-files/proud-boys/;     https://www.adl.org/resources/backgrounder/oath-keepers;  https://www.splcenter.org/resources/extremist-files/oath-keepers/; https://extremism.gwu.edu/proud-boys;

there were an estimated 250 injured law enforcement officers from numerous agencies. One hundred-fourteen USCP officers reported injuries. Five police officers who were at the Capitol on January 6th died in the days following the riot.

*Id.,* pp. 91, 71.[3]

This government, via the President of the United States, also recently pardoned, or granted clemency to, 77 lawyers, government officials and private citizens – including the President's own lawyers and officers in his own administration – for their efforts related to attempts to overturn the results of the 2020 election through the "fake electors plot" and various other debunked, baseless criminal schemes.[4]  The President has threatened retribution, and has started to make good on those threats, against the state of Colorado due to the Colorado Governor's refusal to release the President's ally, Tina Peters, from prison.  Ms. Peters is serving a sentence related to her jury convictions for various election office data breaches in an effort overturn the results of the 2020 election.[5]

In other words, those who are charged with, or convicted of, election interference and political violence related crimes are protected and rewarded by this government, at least so long as they are seen as political allies.  This includes those who are widely thought to be white supremacists and those who display symbols that most people see as symbols of hate.  Any sentence at all against Ms. Blackcloud under

---

[3] https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf
[4] https://www.justice.gov/pardon/media/1420861/dl?inline
[5]    https://www.washingtonpost.com/politics/2026/01/07/why-trump-cares-about-clean-water-pipeline-colorado/; https://www.coloradopolitics.com/2025/12/31/rot-in-hell-trump-post-reignites-feud-with-colorado-gov-jared-polis-over-tina-peters/

some notion that she has committed political violence or election interference would create a disparity in sentencing because this government has exonerated rather than punish for election and political violence crimes.  Under 18 U.S.C. § 3553(a), the Court must consider the need to punish, deter, protect, promote respect for the law and avoid unwarranted sentence disparities.   When the government itself treats categories of defendants differently based on politics or urges severe sentences only in cases that do not involve political allies, it is the Court's role to exercise reason and restraint to impose a sentence that is sufficient but not greater than necessary.

Finally, the government urges the Court not to look at mitigating factors of Ms. Blackcloud's background, stating that "the defendant's crime has absolutely no grounding in any personal history or circumstances."  Of course, the Court is required by § 3553(a) to look at the history of the defendant and we disagree based on the Mitigation Report that Ms. Blackcloud's background is irrelevant here.

Respectfully Submitted,

BRITT M. COBB, LAW OFFICES
Dated: January 8, 2026          Attorney for Defendant Blackcloud

s/      *Britt M. Cobb*

Britt M. Cobb (30099)
3570 E. 12th Avenue, Suite 200, #142
Denver, CO 80206
(303) 351-1628
britt@brittmcobb.com